UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CHRISTINE A. NYGREN | Civil Action No. 20-cv- |
| *plaintiff,* | Section      Division |
| versus | District Judge |
| DOLLAR TREE, INC., DOLLAR TREE STORES, INC., DOLLAR TREE MANAGEMENT, LLC, AND DOLLAR TREE MANAGEMENT, INC., | Magistrate Judge |
| *defendants.* | |

**COMPLAINT**

Christine A. Nygren ("Chris") supports her right to recover from her former employer with these legal and factual allegations:

**PREFATORY STATEMENT**

1.    Chris seeks to hold her employer of 21 years accountable, under federal and state law, for:

    a.    firing her for not complying with a discriminatory relocation policy it unlawfully enforced only against its oldest employees;

    b.    intensifying its already-discriminatory "policy" (and firing her) in retaliation against her after she complained about age-based discrimination;

    c.    harassing her when she refused to comply with the age-based quid pro quo the employer offered; and

    d.    creating a hostile work environment in the months before her employment termination.

## PARTIES

**2.**     Chris is a natural person of the full age of majority; all material times she has resided

and kept her domicile in Jefferson Parish, Louisiana.

**3.**     Made defendant is Chris's former employer:

   **a.**     **Dollar Tree, Inc. ("DTI")** is a business incorporated in and under the laws of
the State of Virginia, with a principal place of business in Chesapeake, Virginia;

   **b.**     **Dollar Tree Management, LLC ("Management LLC")** is a limited liability
company organized in and under the laws of the State of Virginia. Management LLC is the survivor-by-conversion from co-defendant Dollar Tree Management, Inc., by Plan of Entity Conversion effective February 1, 2020. Upon
information and belief, none of DT Management LLC's members are citizens
of the State of Louisiana;

   **c.**     **Dollar Tree Management, Inc. ("Management Inc.")** is or was a business incorporated in and under the laws of the State of Virginia. Management Inc.
was converted to co-defendant Management LLC, by Plan of Entity Conversion effective February 1, 2020. Management Inc.'s principal place of business was in Chesapeake, Virginia;

   **d.**     **Dollar Tree Stores, Inc. ("Stores Inc.")** is a business incorporated in and under the laws of the State of Virginia, with a principal place of business in
Chesapeake, Virginia, licensed to do and doing business in the State of Louisiana;

   **e.**     The defendants named in ¶ 3.a-d, above, will be collectively, "Dollar Tree"
in these allegations.[1]

## JURISDICTION

**4.**     **Subject matter.** The Court has 28 U.S.C. § 1331 (federal question) original jurisdiction over Chris' Age Discrimination in Employment Act ("ADEA") and related retaliation and harassment claims ("ADEA claims").

---

[1] Although Chris was hired by Dollar Tree, Inc., paid by Dollar Tree, Inc., and offered the "relocate or be fired" deal by Dollar Tree, Inc., Dollar Tree suggested in its EEOC response that Dollar Tree Management, Inc. was Chris' real employer. Chris has no reason to believe this is true, but out of an abundance of caution, names any entity she believes might have been her employer.

5.     For Chris's Louisiana Employment Discrimination Law ("LEDL") age discrimination[2] and related state law retaliation[3] claims:

    a.     supplemental subject matter jurisdiction exists under 28 U.S.C. § 1367(a) because the state law claims are so related to her ADEA claims that they form part of the same Article III case or controversy; and

    b.     subject matter jurisdiction also exists under 28 U.S.C. § 1332(a), where the amount in controversy, exclusive of fees and costs, exceeds $75,000 and there is complete diversity of citizenship between Chris, a Louisiana citizen, and the defendants, none of which are Louisiana citizens.

6.     *In personam.* The Court may exercise jurisdiction over these defendants because they regularly transact business in Louisiana, they regularly employ Louisiana citizens to do their work, they have committed tortious acts within Louisiana creating the causes of action here, and they derive substantial revenue from their Louisiana-focused efforts.

7.     Because the defendants do business in Louisiana through a Louisiana-registered entity (Stores, Inc.) who has appointed a registered agent for service of process within this state, they're "present within Louisiana" at this suit's commencement.

8.     As shown above, these defendants have established minimum contacts with Louisiana, arising both from this case's specific facts and from Dollar Tree's general, longstanding activities aimed at this state, so that the exercise of jurisdiction over them comports with the requirements of fair play, substantial justice, and the Fourteenth Amendment to the Constitution of the United States.

---

[2] La. Rev. Stat. § 23:312 *et seq.*          [3] La. Rev. Stat. § 51:2256 *et seq.*

**VENUE**

9.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because Dollar Tree employed Chris within (Jefferson Parish) this judicial district, Dollar Tree executed its discriminatory scheme against Chris and terminated her employment from within (same) this judicial district. So a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

**PROCEDURAL AND
STATUTORY PREDICATES**

10.   In 2018 and 2019, each of the named defendants employed more than 20 full-time employees; in the alternative these defendants constitute a single enterprise for ADEA and related state law liability.

11.   And, in 2018 and 2019, when it discriminated against, harassed, and terminated Chris, Dollar Tree was her ADEA and LEDL employer.

12.   Dollar Tree HR Vice President Steve Schumacher terminated Chris' employment on April 5, 2019.

13.   Before she was terminated, and continuing through post-termination, Chris notified Dollar Tree management in writing of the alleged discrimination, she tried to amicably resolve this matter, and she revealed to Dollar Tree that she intended to pursue this in Court, all of which were more than 30 days before this complaint's filing.

14.   On October 23, 2019, within 300 days of her termination and Dollar Tree's last adverse employment action, Chris filled out an intake questionnaire and filed an EEOC Charge of Discrimination with the EEOC New Orleans Field Office (which, because of work-sharing agreement with the Louisiana Commission on Human

Rights, was automatically accepted for filing with the LCHR, terminated, and referred to the EEOC for processing) alleging that Dollar Tree discriminated against and wrongfully terminated her in violation of the ADEA and Louisiana law [EEOC No. 461-2020-00205].

15.    On August 10, 2020, the EEOC issued Chris a *Notice of Right to Sue* in EEOC No. 461-2020-00205.

16.    Chris timely makes this *Complaint* within 90 days of her receipt of EEOC's *Notice of Right to Sue*.

## FACTS

PARTIES.

17.    Chris is an unemployed 71-year-old human resources (HR) professional; her children are grown and live with their own children in Louisiana.

18.    Dollar Tree, headquartered in Chesapeake, Virginia, describes itself as "the largest and most successful single-price-point retailer in North America, operating thousands of stores across 48 contiguous states and five Canadian provinces, supported by a solid and scalable logistics network." Dollar Tree operates 15,000+ stores across the 48 contiguous states and five Canadian provinces, supported by a coast-to-coast logistics network.

19.    Dollar Tree, which employs more than 193,000 people, reported "record net sales of $23.61 billion" in its 2019 Annual Report.

CHRIS' SERVICE TO DOLLAR TREE.

20.    Dollar Tree hired Chris on in 1997 as a full-time District Manager for $34,000 annual salary.

21.     Months later, when Dollar Tree de-centralized its HR for the first time, Chris agreed to work as a <u>Field Human Resources Manager</u> for $38,000 salary.

22.     In 1998 and 1999, Dollar Tree upped Chris' salary to $40,500 and $43,750 as she continually received "meets" or "exceeds" year-end evaluations. At this point, Chris took the initiative to become the only Dollar Tree employee certified by the Society for Human Resource Management.

23.     In 2000, Chris was again promoted, this time to <u>Regional Director of Operations</u>. Her pay increased to $55,000, with a subsequent "meets" 6-months evaluation increasing her base salary to $60,000.

24.     Dollar Tree promoted Chris again on in 2001, this time to serve as <u>Zone Human Resource Director</u> for $70,000 in salary. Although she's held this position since 2001, her "zone" assignments and responsibilities have varied considerably according to Dollar Tree's shifting whims, sometimes to accommodate less-qualified and younger employees or applicants.

25.     Chris often responded to positive evaluation commentary by explaining that Dollar Tree wasting her talent and experience. Even worse, she complained Dollar Tree was paying her less than it was paying newer, younger professionals (e.g. a much younger employee who'd taken the Regional Operations Director position *from which Dollar Tree had "promoted" her*).

26.     When Dollar Tree fired Chris, she'd just gotten a "meets expectations" review, she was awarded all her stock grants and bonuses, and her gross pay exceeded $220,000 annually.

**DOLLAR TREE'S DISPARATELY ENFORCED RESIDENCE POLICY.**

27.   Dollar Tree's approach toward its Zone HR Directors and Vice Presidents' residence has been, at all times relevant, fluid and with no discernable company-wide policy.

28.   During Chris' time as Zone HR Director she always lived in the Greater New Orleans area (Zone 2), but she was at different times assigned to serve Zone 3 (Upper Midwest U.S.) and later the newly created Zone 5 (Southwest and Mountain United States).

29.   It wasn't uncommon for Dollar Tree to "promote around" Chris, favoring younger workers with better Zones. Dollar Tree even moved Chris' Zone so a manager Chris had trained several years earlier would have her preferred home, in the Zone where Chris lived.

**UNWRITTEN JULY 2018 DEMAND.**

30.   In July 2018, when Chris' new supervisor (Steve Schumacher, HR Vice President) phoned Chris that that she would need to pack up her belongings and move into her Zone or Dollar Tree would fire her in February 2019.

31.   Chris found the policy strange, because she'd be forced to move out of the New Orleans area (from which she'd previously served Zones 2, 3, and 5) and *somewhere* into Zone 5, which included parts of Louisiana, Texas, Arkansas, Oklahoma, Kansas, Nebraska, North and South Dakota, Colorado, New Mexico, Arizona, Utah, Nevada, Montana, Wyoming, and Idaho.

32.   But as she discussed things with her co-workers, Chris learned:

   a.   the Zone HR Directors ordered to "move or be fired" were the oldest three (56, 65, 69); and

b.      the second-oldest Zone HR director (65), who actually lived in his Zone, was told he needed to move *out of his Zone* or he'd be fired.

CHRIS COMPLAINS.

33.    The next day, Chris explained phoned her chain of command and memorialized the calls with an email to Dollar Tree's then-President and CEO (Gary Philbin) and Bob Sasser (former Dollar Tree CEO; then Dollar Tree Executive Director of Board of Directors) relaying what her supervisor had told her.

34.    Chris complained that only the oldest three Zone HR Directors (56, 65, and 69) were given the "move or be fired" ultimatum. After Dollar Tree's previous approach toward her and where she lived, Chris explained to the executives "[t]his is not how I thought I would ever be treated at Dollar Tree."

35.    Philbin responded by July 17, 2018 email to Chris:

> The hiring/training/retaining of talent will be a different ballgame over the near future as the unemployment landscape has dramatically changed. The need to be in the markets, close to the leadership you and the team Interacts with will never be greater than now and up-coming years. We haven't done this without considering all of the moving pieces involved and of course the impact on our people.

36.    Despite Dollar Tree's professed newfound hiring/training/retaining principles, Chris also knew that one of two Dollar Tree "Field Training Managers" (which were her peers comparatively, too) wasn't required to live in their Zones: he lived in Dallas but didn't even manage in that Zone (5; he managed East Coast: Zones 1, 2, and 6).

DOLLAR TREE'S UNCLEAR INTENTIONS.

37.    On July 18, 2018, Chris asked her supervisor (Schumacher) to forward the details on relocation because she wanted to consider relocation into her Zone.

38.  Schumacher tried to dissuade Chris, explaining "there is a 2-year commitment or [relocation expenses] must be re-paid."

39.  That same day, Chris said she was interested in relocating to Houston – it's in Zone 5 and Chris' daughter lived in Houston but was determining whether to move back to New Orleans to be closer to family.

40.  Schumacher said nothing in response.

DOLLAR TREE MISREPRESENTS CHRIS' POSITION.

41.  Rather than discussing Chris' potential move into her Zone, Schumacher drafted a letter offer which he forwarded her on September 7, 2018:

> As we have discussed, Dollar Tree decided that all Zone Human Resources Directors should reside in the geographic area that they support. You have decided not to relocate to your Zone and instead have asked to continue your employment until you retire in April 2019.

42.  Chris repeatedly conveyed she wasn't interested in retiring, and she told Schumacher that she'd consider moving into her Zone but wanted to discuss it further.

43.  Schumacher did nothing to correct the issue or clarify anything for Chris.

DOLLAR TREE'S CONTINUED OBFUSCATION.

44.  In response to another aged Zone HR Director's concern that he'd be without affordable health insurance for his wife after he was fired (or forced to "retire") for not relocating, Dollar Tree updated its offer to the "old employees" on October 4, 2018 to include a few months of Dollar Tree-provided COBRA payments, which Schumacher discussed and forwarded to Chris on October 5, 2018.

45.   Still, Schumacher was silent about Chris' relocation, which she'd mentioned in July, and the revised "move or retire" letter still confirmed that Dollar Tree's relocation requirement was "to your Zone."

46.   There was no indication other indication that Dollar Tree was requiring Chris to move anywhere other than "into her Zone" or "into the geographic area that [she] support[ed]," here Zone 5 (which included Houston).

DOLLAR TREE CHANGES ITS PRINCIPLES.

47.   Even though Chris had been asking about Houston since mid-July 2018, and even though Dollar Tree had put its "policy" (Zone HR Directors need to live in their Zone) into two different written offers, Dollar Tree waited until the first week of October to "revise" those principles.

48.   After all, Dollar Tree's first stab at culling out the older workers with the discriminatory "move into your Zone" policy didn't work – and Chris had begun to complain.

49.   She was even showing signs of wanting to stick around by complying.

50.   At some point between October 4 and October 9, Schumacher phoned Chris that Dollar General wasn't just requiring its Zone HR Directors to *live in their Zone* (as it stated in the September and October separation offers), but that they *must also live in the same city as their Zone VP.*

51.   For Chris, that would mean Dallas. This had never been discussed.

52.   Not in July. Not in August. Or even September.

53. Chris found Dollar Tree's shifting policy reasons disingenuous, mostly because only the three oldest (56, 65, 69) of the six Zone HR Directors had to abide by the "policy."

54. But more practically, Chris knew <u>none of the other Zone HR Directors lived in the same city as their Zone VP</u>. And at least one of the Zone HR Directors <u>didn't even live in their Zone</u>. None of her younger comparators were given the "relocate or retire (be terminated)" "option."

| Zone | VP residence (zone) | HR Dir. Residence (zone) | Approx.   HR Dir Age | Required to move? |
|------|---------------------|--------------------------|----------------------|-------------------|
| 1 | Norfolk (6) | Connecticut (1) | 52 | No |
| 2 | Norfolk (6) | Norfolk (6) | 65 | **Yes** |
| 3 | Chicago (3) | Norfolk (6) | 56 | **Yes** |
| 4 | NorCal (4) | SoCal (4) | 55 | No |
| 5 | Dallas (5) | New Orleans (2) | 69 | **Yes** |
| 6 | Norfolk (6) | Ohio (6) | 45 | No |

55. On October 9, 2018, Chris wrote Dollar Tree Deputy General Counsel (Corporate) Kay Stockwell, conveying that when approached with the "Zone policy" she "ask[ed] about moving to Houston . . . Houston is in Zone 5. I , then, was told I had to move to Dallas ---city specific. **I do not want to retire** ---I am being told --- move to Dallas or retire." (**emphasis added**).

56. There was no response.

57. What's more, despite Chris' demand, Schumacher resisted putting the "not just Zone, but also Zone VP residence" "move or retire" demand into writing.

58. Finally, though, Schumacher passed along a letter amending Chris' "offer" on October 16, 2018 to read:

> Dollar Tree decided that all Zone Human Resources Directors should reside in the geographic area that they support, specifically Dallas for Zone 5. You have decided not to relocate to

Dallas and instead have asked to continue your employment until you retire in April 2019.

59.  Of course, everyone knew Chris didn't want to retire and the letter was a complete misrepresentation.

60.  More than once, Chris begged for an explanation from anyone who would  listen. She even brought the matter up at late January 2019 Zone/Regional Director (1/21-1/24) and HR/Zone HR (1/24-1/25) meetings, specifically directing the problem of forced relocation or forced retirement to Dollar Tree's Chief Human Resources Officer, Betty Click on January 24, 2019.

61.  Click's response was that, as the HR boss, she had no control over the operations-side of things at Dollar General, preferring to characterize the "move or retire" policy, which Dollar Tree is not enforcing against its younger Zone HR Directors, as an "operations" directive, rather than an HR matter.

62.  The problem with Dollar Tree's "policy" isn't that it requires relocation, it's that it's only being enforced against individuals protected by the ADEA – while younger comparators enjoy continued employment without the "move to your Zone VP's town (or even into your Zone at all in some cases) or be fired" edict.

63.  Indeed, so arbitrary was the Dollar Tree non-policy that Chris' 65-year-old coworker was fired for <u>not violating</u> (by not relocating away from the city where his Zone VP lives) it; while Chris was fired for <u>violating</u> (for not moving to the city where her Zone VP lives) it.

64.  Dollar Tree held Chris (69), Jerry Sankey (65), and Terri (56) to a higher standard than their 3 younger counterparts, none of whom have been given the "move into

your zone or be fired/retired" edict – and all of whom continue to live in different cities than their Zone VP (and in at least 1 case, in a different Zone altogether).

HARASSMENT.

65.   As HR Directors (and members of the class protected by ADEA) themselves, Chris and the other two individuals being discriminated against knew of the hostile work environment which existed at Dollar Tree for older workers.

66.   They knew Dollar Tree so often considered and made decisions based on whether an employee "had enough runway."

67.   They knew about one aged Zone VP being denied a job he wanted and told that he needed to "retire and get a hobby."

68.   And despite Chris' repeated insistence that she didn't want to retire, Chris for months knew Dollar Tree would force it on her.

69.   It wasn't just the separation agreements Dollar Tree directed at her, mischaracterizing her resistance to move to satisfy a policy which wasn't even real.

70.   Instead, it was more humiliating things. Things like gifts, faux "retirement parties" for Chris and Sankey – or management-generated poems celebrating their "retirement" which were circulated by email to an army of colleagues who well knew these two were being fired:

### Upcoming Retirements of Chris Nygren and Jerry Sankey

**Amber Lantern Restaurant**
**January 24, 2019**

It's time for a toast of wine
To celebrate Chris and Jerry approaching the finish line
Both are about to conclude wonderful careers in Operations
and HR that were mighty fine

> And tonight they have the spotlight to shine
> Looking back over years when they had to read each sign
> Trying to decipher what came at them directly and what was
> received over the grapevine
> Working to make Operations and associates effectively com-
> bine
> And taking partners to be certain everything would align
> Now they get to feel great satisfaction in what they were able
> to design
> And as part of the process experience the wonderful feeling of
> being on cloud nine
> Tomorrow's newspaper will contain an important headline
> "After decades of hard work Chris Nygren and Jerry Sankey
> finally get to relax and recline"

**CHRIS IS FIRED.**

71.    At all times relevant to this lawsuit, including at the time of Chris' termination, her immediate supervisor was Dollar Tree's Vice President of Human Resources, Steven Schumacher.

72.    At all times relevant to this lawsuit, including at the time of Chris' termination, Schumacher was Dollar Tree's final decision-maker and Dollar Tree gave him the authority to terminate Chris' employment if she didn't submit to the discriminatory "move or be fired" policy Dollar Tree only enforced against its oldest Zone HR Directors.

73.    And, after Chris, through undersigned and in February 2019, tried to resolve this dispute, informing Dollar Tree of her intention to sue for discrimination, Schumacher did in fact fire her on April 5, 2019.

AFTERMATH.

74. For almost a year before she was fired, Chris watched while younger HR directors were being permitted to live in different cities than their Zone VP (and, in at least one of her younger comparators' cases, outside the Zone altogether).

75. Despite Chris' plaintive emails informing Dollar Tree executives and its Deputy General Counsel she did not want to retire, Dollar Tree's unlawful conduct was also severe and pervasive enough to change Chris' condition of employment and create an abusive and hostile work environment.

76. Chris cannot unlearn that Dollar Tree views and speaks of employees her age as "not having much runway left" – and she can't forget the treatment Dollar Tree gave her (even younger, but still aged) coworker when he aspired a promotion ("you need to retire and get a hobby").

77. Neither will Chris be able to forget months of Dollar Tree's initiation or prompting of "retirement" congratulations, parties, customized cakes, and even poetry describing the faux "retirement." Chris has been humiliated. She spent months seeing her job posted online.

78. And every aging worker's dream, retirement after a successful and rewarding career, will never become a reality for Chris. Despite her 21 years of devotion and her retirement goal being but 6 years away, she was fired for not complying with a policy not required of her younger comparators.

79. Before it fired her, and in response to Chris' amicable demand to settle, Dollar Tree's noted its highly conditional, "grant of Chris' request to continue [her] employment until [she retires] in April 2019" – this was the final, parting blow. Chris had, for

many months revealed she didn't want to retire and that she felt she was being forced out because of her age.

80.   After it fired her, Dollar Tree disputed Chris' unemployment claims, stating to the Louisiana Workforce Commission that she retired and quit.

81.   Upon information and belief, based on the facts and circumstances described throughout this lawsuit, Schumacher and Dollar Tree terminated Chris' employment in violation of the ADEA, they knew this conduct was illegal under the ADEA, and they purposefully violated the ADEA despite this knowledge.

82.   This is particularly true where Chris, in writing and in person, repeatedly raised the issue with Dollar Tree's CEO, its HR head, and even its corporate counsel, all with no meaningful response.

83.   Based on the circumstances, Schumacher (and his superiors involved in this decision-making process) retaliated against Chris, both by intensifying the discriminatory "policy" (from "Zone" to "VP's city of residence") for her and by terminating her employment, while acting at Dollar Tree's request or as Dollar Tree's bona fide agent and within the course and scope of their employment duties.

84.   Dollar Tree is thus liable for all the discriminatory and retaliatory adverse employment actions alleged in this case.

85.   After Dollar Tree terminated Chris, she lost her employment, income, medical insurance, stock grant potential, and other fringe benefits.

86.   Chris earnestly searched for replacement work right after her termination.

87.   Chris cannot find any replacement work, and she's gotten no employment offers for about a year and a half after Dollar Tree terminated her employment.

88.   Chris would have worked until age 75 and thus she is out a significant sum of lost wages, benefits, and out-of-pocket expenses incurred because of Dollar Tree's unlawful discrimination, harassment, retaliation, and termination.

89.   Chris also has suffered intense emotional distress, mental anguish, loss of enjoyment of life, fear related to the loss of her health insurance, all of which have been caused by Dollar Tree's unlawful termination (and related) decision(s).

**COUNT ONE:**
**Age-Based Disparate Treatment Discrimination**
**Age Discrimination in Employment Act**
**[29 U.S.C. § 621 *et seq.*]**

90.   Chris incorporates her earlier allegations by reference to state a cause of action of unlawful disparate treatment discrimination under the ADEA, as amended, against Dollar Tree.

91.   Under the ADEA, an employer may not "discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a).

92.   To prevail for discriminatory discharge under the ADEA, plaintiff must prove "that age was the 'but-for' cause of the challenged employer decision." *Williams v. Waste Mgmt., Inc.*, 818 Fed. Appx. 315, 318-19 (5th Cir. 2020).

93.   For now, Chris points to circumstantial evidence of discrimination, triggering "the burden-shifting framework first articulated in *McDonnell Douglas* for Title VII claims of employment discrimination." *Id.* (internal citations omitted).

94.   Under the applicable burden-shifting framework, plaintiff must first establish a prima facie case that he was:

a.     discharged;

b.     qualified for the position;

c.     within the protected class when discharged;

d.     and . . . discharged because of her age. *Id*. (citation omitted).

95.   If Chris establishes that prima facie "the burden shifts to [Dollar Tree] to articulate a legitimate, nondiscriminatory reason for the termination."

96.   In the Fifth Circuit, a replacement worker or comparator who is five years younger than the plaintiff may be "significantly" younger.

97.   A private employer who willfully discriminates against an employee based on the employee's age is liable for the employee's lost back wages, lost future wages, compensatory damages, liquidated damages, litigation costs, and reasonable attorney's fees.

98.   Chris was fired from a job she held without incident, having been promoted from a $34,000 salary to over $220,000 in pay at termination, when she was 69 years old, for not complying with a policy which wasn't enforced against her younger comparators [Zone HR Directors and Field Training Managers, all of which were at least 5 years younger than Chris].

99.   And as further disparate treatment, there was even discrimination within the class of aged employees being told to "relocate or retire" where the youngest of the three, a full 10+ years younger than Chris or her 65-year-old coworker, could look for another job within Dollar Tree while Chris and the 65-year-old coworker were denied the opportunity.

100.  Chris specifically alleges that Dollar Tree terminated her because of her age, and that the facts will show that Dollar Tree never intended to, nor did it, enforce the relocation "policy" against Chris' younger comparators.

101.  And despite Chris' complaints all the way up the Dollar Tree chain of command, it never corrected its treatment of her, and terminated her anyway.

102.  Thus, Dollar Tree owes Chris her lost back wages, lost future wages, liquidated damages, litigation costs, and reasonable attorney's fees arising from Dollar Tree's unlawful termination decision.

**COUNT TWO:**
**Retaliation**
**Age Discrimination in Employment Act**
**[29 U.S.C. § 623(d)]**

103.  Chris incorporates her earlier allegations by reference to state a cause of action of retaliation under the Age Discrimination in Employment Act (ADEA), as amended, against Dollar Tree.

104.  To state a prima facie retaliation claim under the ADEA, a plaintiff must show: "(1) that he engaged in a protected activity, (2) that there was an adverse employment action, and (3) that a causal link existed between the protected activity and the adverse employment action." *Heggemeier v. Caldwell Cty., Texas*, 826 F.3d 861 , 869 (5th Cir. 2016).

105.  Here, after Chris complained about what she felt was a Dollar Tree "policy" only being enforced against aged workers, Dollar Tree retaliated by:

a.  intensifying its already discriminatory "policy" (now she wouldn't just have to move into her Zone; she'd be fired if she didn't move into her Zone VP's residence city);

b.     denying her the ability to find alternate employment; and

c.     terminating her.

### COUNT THREE:
### Age-Based *Quid Pro Quo* Harassment
### Age Discrimination in Employment Act
### [29 U.S.C. § 621 *et seq.*]

106.   Chris incorporates her earlier allegations by reference to state a cause of action of age-based quid pro quo harassment under the ADEA.

107.   It is unlawful for an employer to discriminate against an employee because the employee refuses to participate a supervisor's discriminatory policies.

108.   Chris' immediate superior Steve Schumacher made two discriminatory proposals to Chris and resisted putting the details of either into writing until he was sure she'd rejected them:

a.     first, he proposed Chris comply with a policy where Zone HR Directors would be fired for not relocating into their Zone, a policy that only affected the three oldest (56, 65, 69) workers;

b.     and then, after Chris showed interest in complying, he proposed Chris comply with a policy where Zone HR Directors would be fired for not relocating into the city where their Zone VP lived – a policy which *none* of Chris' younger (45, 52, 55) aged comparators had to satisfy.

109.   Chris rejected Schumacher's proposals.

110.   Dollar Tree fired Chris.

111.   Dollar Tree fired Chris because she rejected the "relocation policy/policies" he proposed to her.

112.   Under comparable Title VII quid pro quo law, Chris doesn't have to prove that her rejection of the proposals was the only reason Dollar Tree fired her. But she must,

and she will, prove that Dollar Tree's decision to fire her wouldn't have occurred if she'd just complied with Schumacher's discriminatory relocation proposals

113. And when Dollar Tree gives the fact finder its reason for firing Chris, if that fact finder isn't satisfied, it may infer that Dollar Tree wouldn't have fired her but for her rejection of Schumacher's discriminatory relocation policy demands.

**COUNT FOUR:**
**Age-Based Hostile Work Environment Harassment**
**Age Discrimination in Employment Act**
**[29 U.S.C. § 621 *et seq.*]**

114. Chris incorporates her earlier allegations by reference to state a cause of action for age-based hostile work environment harassment under the ADEA.

115. Chris is over the age of 40 and Dollar Tree, to advance its discriminatory plan to eliminate its very oldest HR Directors, including Chris, told them they'd have to move to avoid being fired.

116. When they asked for more information, Dollar Tree memorialized a "deal" that had never been discussed, the terms of which misleadingly intimated that the aged employees had essentially begged for a few months' time before they "retired."

117. And then, even after Chris voiced her objections to the highest levels at Dollar Tree, even to its corporate counsel, her superiors continued to make reference to decisions being made based on employees "length of runway" (or lack thereof), to which Chris objected (to her supervisor Steve Schumacher).

118. And for months preceding her termination, and despite *everyone* knowing that Chris wasn't voluntarily leaving, her superiors issued faux congratulations, staged sham dinners, and wrote poetry circulated by email to all Chris' colleagues.

119.   The conduct, under the circumstances, was extremely insensitive, it was something more than simple teasing or offhand comments – it was most of a year of mistreatment that was objectively and subjectively shocking and it changed Chris' entire outlook on her role at Dollar Tree.

**COUNT FIVE:**
**Age-Based Disparate Treatment Discrimination**
**Louisiana Employment Discrimination Law**
**[La. Rev. Stat. § 23:312 *et seq.*]**

120.   Chris incorporates her earlier allegations by reference to state a cause of action for unlawful disparate treatment based on age under Louisiana law.

121.   Under Louisiana's Employment Discrimination Law, no employer may discriminate against an employee based on her age. La. Rev. Stat. § 23:312 *et seq.* Louisiana's anti-age-discrimination statute is modeled after the ADEA, and therefore analysis of the two statutes are functionally identical.  *See e.g.*, *Stewart v. Smitty's Supply, Inc.*, 2020 WL 433362 (E.D. La. 2020).

122.   Accordingly, for all the reasons stated throughout this complaint, and specifically incorporating the analysis of plaintiff's claims of unlawful disparate treatment discrimination under the ADEA, Dollar Tree is liable to Chris for all her damages arising from CSAL's unlawful discrimination, including lost back wages, lost future wages, reinstatement, compensatory damages, litigation costs, and reasonable attorney's fees.

**COUNT SIX:**
**Retaliation**
**Louisiana Employment Discrimination Law**
**[La. Rev. Stat. § 51:2256 *et seq*.]**

123.   Chris incorporates her earlier allegations by reference to state a cause of action re-
taliation under the LEDL and La. Rev. Stat. § 51:2256 *et seq*.

124.   Under La. Rev. Stat. Ann. § 51:2256 *et seq*., no employer may "retaliate . . . in any
manner against a person because he has opposed a practice declared unlawful under
[the LEDL]."

125.   Louisiana's anti-discrimination statutes are generally modeled after federal law, and
therefore analysis of the two statutes are functionally identical.

126.   Accordingly, for all the reasons stated throughout this complaint, and specifically
incorporating the analysis of plaintiff's claims of unlawful disparate treatment dis-
crimination under the ADEA, Dollar Tree is liable to Chris for all her damages aris-
ing from Dollar Tree's unlawful retaliation, including lost back wages, lost future
wages, reinstatement, compensatory damages, litigation costs, and reasonable attor-
ney's fees.

**JURY TRIAL REQUEST; REQUEST FOR RELIEF**

127.   Chris demands a jury to hear any issue so triable.

128.   Plaintiff Christine A. Nygren, requests this complaint be considered good and suffi-
cient, that it be assigned a cause number, a section, and division, and that after all
delays are had, that there be a jury trial on all available issues, and that the Court
issue judgment for the plaintiff, and against the defendant(s), for all manner of relief
available, including above-described lost back wages, lost future wages, statutorily-

uncapped (and likely mandatory) liquidated damages, litigation costs, expansion of the back pay remedy due to negative tax consequences, certain fringe benefits, reinstatement, compensatory damages, and reasonable attorney's fees and costs of this litigation, along with pre- and post-judgment interest, and for all other relief warranted, all premises considered, whether contractual, legal, equitable, injunctive or customary.

Respectfully submitted,

*/s/ Andrew T. Lilly*

**Andrew T. Lilly (La. 32559)**
4907 Magazine Street
New Orleans, Louisiana 70115
t: (504) 812-6388
f: (504) 539-4180
e: andrew@atlpllc.com

***Attorney for plaintiff, Christine A. Nygren***