UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHRISTINE NYGREN                                      CIVIL ACTION

VERSUS                                                  No. 20-2714

DOLLAR TREE, INC., ET AL.                               SECTION I

<u>ORDER & REASONS</u>

Before the Court is defendant Dollar Tree Stores, Inc.'s ("Dollar Tree") motion[1] for summary judgment.  Plaintiff Christine Nygren opposes[2] the motion in part, but she agrees that summary judgment is appropriate for some of her claims.[3]  For the following reasons, the Court grants the motion.[4]

Dollar Tree also filed a motion[5] for sanctions and to strike a declaration that Nygren filed in opposition to summary judgment.  Nygren opposed[6] this motion too. As explained below, the Court grants Dollar Tree's motion in part and strikes, in

---

[1] R. Doc. No. 28 (motion); R. Doc. No. 46 (reply memorandum).

[2] R. Doc. No. 38.

[3] Specifically, Nygren "concedes summary judgment is proper as to [her] . . . ADEA retaliation [claim based on a] July 14, 2018 e-mail complaint," her "state law retaliation" claim, her "harassment" claim, and her "hostile work environment" claim because the retaliation claims are "time-barred" and the harassment and hostile work environment claims "will not prevail on the merits."  R. Doc. No. 38, at 1 n.1. Accordingly, the Court grants summary judgment for Dollar Tree on these claims without further discussion.

[4] Dollar Tree also filed a pending motion to exclude the testimony of Gerald Sankey and Terrie Peters Nathan, two of Nygren's proposed witnesses.  R. Doc. No. 27. Because the Court grants the summary judgment motion, the Court dismisses the evidentiary motion as moot.

[5] R. Doc. No. 43 (motion); R. Doc. No. 55 (reply memorandum).

[6] R. Doc. No. 51 (opposition memorandum).

relevant part, Nygren's declaration as a sham affidavit.  However, the Court declines to impose any sanctions.

For more than twenty years, Nygren worked in Dollar Tree's human resources department.  For most of that time, she served as one of its Zone Human Resources Directors ("ZHRD"), working remotely from Louisiana.  In 2018, Dollar Tree announced its plans to require the ZHRDs to live in the zones they served, near the VPs whom they supported.  Nygren declined to move to Dallas and, the parties agree, was terminated in April 2019.  Nygren claims that her termination was the result of an effort to remove older ZHRDs.  Accordingly, she claims that her termination (1) violated the Age Discrimination in Employment Act (the "ADEA") and the Louisiana Employment Discrimination Law (the "LEDL") in that it constituted disparate treatment; (2) was impermissible retaliation for a February 2019 discrimination complaint; and (3) was an impermissible "age-based quid pro quo."[7]

Dollar Tree argues, in relevant part, that Nygren's claims (1) are time-barred because she failed to timely file a complaint with the EEOC and (2) fail because she has not met her burden to establish that Dollar Tree's proffered non-discriminatory reason for terminating her was, in fact, pretextual.  Finally, Dollar Tree argues that Nygren's "quid pro quo" claim fails as a matter of law.  While Nygren's disparate treatment claim based on her firing, as described in her opposition, is not time-barred, Dollar Tree is otherwise correct.

## I.   BACKGROUND

---

[7] R. Doc. No. 38, at 1.

Dollar Tree hired Nygren in 1997.[8]  In 2015, Nygren became the ZHRD for Zone 5, her role at the time she was terminated.[9]  In that role, Nygren handled human resources issues and supervised regional HR Managers.[10]  Nygren understood that she was employed on an at-will basis.[11]  Nygren was ZHRD for different zones throughout her career at Dollar Tree, all while residing in Metairie, Louisiana.[12]

During the spring of 2018, Steven Schumacher became the Vice President of Human Resources.[13]  On July 13, 2018, Nygren had a telephone conversation with Schumacher, and he informed Nygren for the first time of Dollar Tree's new relocation policy.[14]  This policy required all ZHRDs to reside within the zones they serve. Schumacher told Nygren that she needed to relocate to reside within her zone.[15]  If she did not agree, she would be provided severance and retire.[16]

On July 18, 2018, Nygren asked Schumacher to send her Dollar Tree's relocation package, indicating that she would consider moving to Houston to be

---

[8] R. Doc. No. 28-4, at 4.

[9] *Id.* at 7, 9.

[10] *Id.* at 12–13.

[11] *Id.* at 16–17.

[12] *Id.* at 7–9.

[13] *Id.* at 3.

[14] *Id.* at 31.

[15] R. Doc. No. 38-1, at 4.  In an unsworn declaration, Nygren disputes the salient details of the phone call and what Schumacher told her.  The Court will address the conversation, the unsworn declaration—which it disregards, in relevant part, as a sham affidavit—and the supposed factual disputes *infra*.

[16] R. Doc. No. 51, at 1.

within her zone.[17]   The parties agree, however, that by August 7, 2018, Schumacher told Nygren she would be required to move not only to her zone, but to Dallas.[18]

At the time, Dollar Tree had six ZHRDs, three of whom (including Nygren) were required to relocate.[19]   The other ZHRDs already lived within their respective zones, though not necessarily in the same city as their Zone VP, and were not required to relocate.[20]   The three out-of-zone ZHRDs were required to relocate closer to their VP within the zone.[21]   The three ZHRDs subject who were not in compliance with the policy, and were therefore subject to this relocation requirement, were the oldest of the ZHRDs—though the youngest ZHRD forced to relocate was only a year older than the oldest ZHRD not required to relocate (and three years older than the second-

---

[17] R. Doc. No. 38-1, at 13.
[18] *Id.* at 14.
[19] *Id.* at 9.
[20] *Id.* at 9–10.
[21] *Id.* at 3.

oldest non-mover).[22]  The other two ZHRDs forced to move, Jerry Sankey and Terri Peters, refused to relocate and accepted Dollar Tree's severance packages.[23]

On July 14, 2018, the day following Nygren's initial conversation with Schumacher, Nygren sent an email to Dollar Tree's CEO, Gary Philbin, to protest the new relocation requirement.[24]  In this email, Nygren wrote, "I received a call yesterday, from Steve Schumacher.  It seems I have until February 2019 to move to Texas – or I no longer have a job . . . I am out unless I pack up my belonging [sic] and move . . . I understand the motive."[25]  Philbin responded to Nygren explaining that the justification for the relocation policy was for her and the other ZHRDs "to be in the markets, close to the leadership you and the team interacts with."[26]  Philbin then directed Nygren to speak with Dollar Tree Chief People Officer Betty Click about the relocation process.[27]

---

[22] *See* R. Doc. No. 38-1, at 9 (indicating Peters was 56 and Rhoten was 54).  Nygren admits the facts contained in the following chart:

| ZONE | ZONE HR DIRECTOR(AGE) | PLACE OF RESIDENCE | LIVED IN ZONE? | ZONE VP | ZONE VP CITY OF RESIDENCE |
|------|------|------|------|------|------|
| 1 | Mary Ann Fulner (52) | Killingworth CT | Yes | Doug Yost | Virginia Beach VA |
| 2 | Jerry Sankey (65) | Chesapeake VA | No | Russ Harden | Manteo NC |
| 3 | Terri Peters (56) | Virginia Beach VA | No | Dawn Martinez | St. Charles IL |
| 4 | Karen Rhoten (55) | Temecula CA | Yes | Ginger Chase | Las Vegas NV |
| 5 | Christine Nygren (69) | Metairie LA | No | Brian Prettyman | Dallas TX |
| 6 | Jeremie Mapes (45) | Dublin OH | Yes | Pete Barnett | Virginia Beach VA |

*Id.*
[23] *Id.* at 4.
[24] *Id.* at 6.
[25] *Id.*
[26] *Id.* at 7.
[27] *Id.*

On February 13, 2019, Andrew Lilly, Nygren's counsel, wrote to Dollar Tree asserting claims of age discrimination and proposing a settlement.[28]  On March 6, 2019, a Dollar Tree attorney responded, writing that no age discrimination had occurred.[29]  She added that, in light of Nygren's stated personal reasons for wanting to relocate to Houston, Dollar Tree would allow her to do so, but reserved the right to change Nygren's Zone and/or required home base in the future.[30]  Shortly thereafter, Schumacher called Nygren and told her Dollar Tree would be happy to have her in Houston.[31]  Nygren rejected the offer,[32] saying "you gave me a date of April 5th I had to be out.  But we've had this conversation since July 13th and you've said no, no, no.  As soon as I get an attorney, things change.  I can't talk to you anymore.  You call my attorney, I'm not having any more conversation with you."[33]

On March 25, 2019, Nygren received her final performance evaluation from Schumacher.[34]  She received a 'meets expectation' rating, and received her annual bonus, stock grants, and a merit pay increase.[35]  She did not consider this to be age discrimination or retaliation.[36]

---

[28] *Id.* at 20.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] Nygren now claims that the rejection was not of a move to Houston, but the terms proposed by Dollar Tree.  While that contention is impossible to square with her testimony, quoted above, the issue is immaterial.
[33] *Id.* (quoting R. Doc. No. 38-9, at 26).
[34] *Id.* at 22.
[35] *Id.*
[36] *Id.*

Nygren's last day with Dollar Tree was April 5, 2019.[37]  She filed her EEOC charge on October 22, 2019.[38]  And she filed her complaint in this matter on October 4, 2020.[39]

## II.   STANDARD OF LAW

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that there is no genuine dispute of material fact.  *See* Fed. R. Civ. Proc. 56.  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case.  *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The showing of a genuine issue is not satisfied

---

[37] *Id.* at 23.
[38] R. Doc. No. 38, at 15.
[39] R. Doc. No. 1.

by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence[.]" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also In re Taxotere (Docetaxel) Products Liab. Litig.*, 994 F.3d 704, 710 (5th Cir. 2021) ("The 'judge's inquiry, [at the summary judgment state] . . . unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.'") (quoting *Anderson*, 477 U.S. at 252).

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *See Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

### III.   ANALYSIS

#### A.   Proper Materials for Summary Judgment

The Court first resolves a dispute about what materials are proper to consider on summary judgment. Nygren submitted an unsworn declaration[40] as an exhibit to oppose Dollar Tree's motion for summary judgment. In response, Dollar Tree filed a motion to strike and for sanctions.[41]

Dollar Tree maintains that Nygren's declaration "contains numerous statements that directly contradict Plaintiff's prior sworn deposition testimony and the judicial admissions in her Complaint."[42] Based on those contradictions, Dollar Tree asserts that Nygren "committed perjury either in her deposition or in her Declaration."[43] Overall, Dollar Tree submits the declaration is "a bad faith attempt to avoid summary judgment."[44]

Nygren responds that striking the declaration is inappropriate because it is not "'so markedly inconsistent' with a prior statement as to 'constitute an obvious sham.'"[45] She also notes that where a declaration supplements the earlier statements, rather than contradicts them, or where the statements can be reconciled, the declaration should not be disregarded.[46] She explains that her declaration "isn't made to undo her prior testimony or pleadings . . . [r]ather, [it] builds on them."[47]

## 1.    **Standard**

---

[40] R. Doc. No. 38-5 ("Unsworn Declaration of Christine A. Nygren").

[41] R. Doc. No. 43.

[42] *Id.* at 1.

[43] *Id.*

[44] *Id.*

[45] R. Doc. No. 51, at 5 (quoting *Winzer v. Kaufman County*, 919 F.3d 464, 472 (5th Cir. 2019)).

[46] *Id.* (citing *Winzer*, 916 F.3d at 473).

[47] *Id.*

"It is well settled that [the Fifth Circuit] does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (citing *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 137 n.23 (5th Cir. 1992) and *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984)). Put another way, the 'sham affidavit rule' provides that, to "the extent [a] declaration attempts to 'tell the same story differently' from [prior] deposition testimony, it is properly not considered." *Love v. Motiva Enters., LLC*, 349 F. App'x 900, 903, n.1 (5th Cir. 2009) (quoting *S.W.S.*, 72 F.3d at 496) (alterations in original omitted).

Similarly, a "party . . . may not rebut a judicial admission made in its pleadings with new evidence or testimony." *Giddens v. Community Educ. Ctrs., Inc.*, 540 F. App'x 381, 390 n.3 (5th Cir. 2013) (citing *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 107–08 (5th Cir. 1987)). Specifically, "a party is bound by admissions made in his pleadings, such that he cannot present evidence contradicting those pleadings for the purpose of defeating a summary judgment motion." *Id.* at 391 (citing *Davis*, 823 F.2d at 107–08).

This makes sense: "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (quoting *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)); *see also Scott v. Harris*, 550 U.S. 372,

380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

But, "[w]hen an affidavit merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment." *S.W.S.*, 72 F.3d at 496 (citing *Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir. 1988)). "An affidavit supplements prior testimony if it 'simply clarifies or amplifies the facts by giving greater detail or additional facts not previously provided in the deposition.'" *Sabre Indus. Inc. v. Module X Solutions, L.L.C.*, 845 F. App'x 293, 298 (5th Cir. 2021) (per curiam) (quoting *S.W.S.*, 72 F.3d at 496) (alterations omitted). "On this point, context matters; [the Fifth Circuit] has determined that a later affidavit is supplementary when the prior deposition testimony only glanced upon the disputed issue." *Id.* (citing *Clark*, 854 F.2d at 766). "The inquiry, as a whole, is aimed at gleaning whether the later affidavit is 'so markedly inconsistent with the affiant's prior deposition as to constitute an obvious sham.'" *Id.* (quoting *Clark*, 854 F.2d at 766).

## 2.   Discussion

After reviewing Nygren's complaint, deposition testimony, and her declaration, the Court concludes that the declaration contradicts her earlier statements and must be stricken.

In Nygren's declaration, she states that she "never told Steve Schumacher I wouldn't move to Dallas.  Though Schumacher told me I could move or opt for a severance package, he never explained to me what would happen if I agreed to neither."[48] She adds that "[a]t no point during our discussion about relocation did Schumacher tell me I was fired or that if I didn't move by some date in the future that I'd lose my job."[49]  She also states "Schumacher never gave me a deadline for deciding when I'd relocate.  He often told me just to let him know when I'd made my mind up what I'd do."[50] She also says that "[t]he only dates I was ever told about were the voluntary separation dates that [the other two impacted ZHRDs] negotiated and agreed to.  Nobody told me that April 5, 2019 was a deadline for those who hadn't voluntarily separated or that I had to figure out my relocation situation by then."[51]

Dollar Tree reasons that Nygren's complaint and her deposition testimony directly contradict many of the statements in her declaration.  For example, the complaint describes Dollar Tree as having offered Nygren a "'relocate or be fired' deal."[52]  And the complaint alleges "[i]n July 2018 . . . [Nygren's] new supervisor ([Schumacher]) phoned [Nygren] that that [sic] she would need to pack up her belongings and move into her Zone or Dollar Tree would fire her in February 2019."[53]

---

[48] R. Doc. No. 38-5, at 2.
[49] *Id.* at 3.
[50] *Id.*
[51] *Id.*
[52] R. Doc. No. 1, at 2 ¶ 3 n.1.
[53] *Id.* at 7 ¶ 30.

Dollar Tree argues that the relevant statements in Nygren's declaration should be disregarded for purposes of the summary judgment motion because they attempt to "tell[] the same story differently" from her deposition testimony and her complaint.[54]

Nygren argues, unsurprisingly, that striking the declaration is inappropriate because it is not "'so markedly inconsistent' with a prior statement as to 'constitute an obvious sham.'"[55]   She also notes, as mentioned, that where a declaration supplements earlier statements, rather than contradicts them, or where the statements can be reconciled, the declaration should not be disregarded.[56]   She explains that her declaration "isn't made to undo her prior testimony or pleadings . . . [r]ather, [it] builds on them."[57]   This is so because Nygren "made her declaration to highlight the difference between what she *believed or feared* and what Schumacher *actually told her*."[58]

Continuing, she argues that "[n]owhere in [her] deposition testimony was she asked whether anyone at [Dollar Tree] told her (in writing or otherwise) of an effective date for termination, or even that termination would result if she didn't relocate or accept severance."[59]

---

[54] R. Doc. No. 43-1, at 8 (quoting *S.W.S.*, 72 F.3d at 495–96).  Dollar Tree also argues extensively that sanctions, up to the dismissal of the entire lawsuit, are appropriate. The Court declines to sanction Nygren.
[55] R. Doc. No. 51, at 5 (quoting *Winzer*, 919 F.3d at 472).
[56] *Id.* (citing *Winzer*, 916 F.3d at 473).
[57] *Id.*
[58] *Id.* at 2 (emphasis retained).
[59] *Id.* at 5.

Turning to the problems posed by the complaint, Nygren, after noting that Dollar Tree denied a number of the relevant allegations in the complaint,[60] argues, *without citing a single case to support such a radical notion*, that the allegations are not binding because "[t]hey are post-termination allegations drafted by a lawyer, to describe [Dollar Tree's] discriminatory policy."[61]  She also describes the allegations as "unsworn" and "thematic advocacy . . . made by counsel."[62]

As an initial matter, a genuine dispute as to the form and details of the notice Nygren received is likely immaterial.  Nygren does not dispute that she "believed" she would lose her job if she did not move.  *Phillips v. Leggett & Platt, Inc.*, 658 F.3d 452, 455 (5th Cir. 2011), discussed at length *infra*, directs the Court to ask whether Nygren "knew, or reasonably should have known" of the planned action.  If Nygren is suggesting that there is a distinction between 'knowing' and 'correctly believing' something, she fails to identify any caselaw suggesting that this distinction makes a difference.

But, even if it does, the Court *cannot* consider the relevant portions of the declaration.  Even if one accepts Nygren's explanation that the purpose of the declaration was to highlight what Dollar Tree told her, whereas her testimony described what she 'believed,' irreconcilable differences remain.  For example, Nygren

---

[60] The Court does not see why that is relevant; Nygren offers no precedent suggesting an allegation in a pleading ceases to be a judicial admission when the other party denies it.

[61] *Id.* at 7.  This argument is also perplexing.  Why does the timing of the complaint matter? And is Nygren suggesting that allegations are only judicial admissions when they are made by a party proceeding *pro se*?

[62] What does that mean, exactly?  Nygren's counsel signed her complaint.

14

declared that she "never told . . . Schumacher [she] wouldn't move to Dallas."[63]  But, during her testimony, Nygren repeatedly confirmed that she *told Schumacher just that*.[64]  Even Nygren's explanation, strained as it is, cannot explain this discrepancy. And this is not a minor point.

Similarly, Nygren's declaration states that "[a]t no point during our discussions about relocation did Schumacher tell me . . . that if I didn't move by some date in the future I'd lose my job."[65]  But she testified that Schumacher told her during their very first conversation that Dollar Tree was "requiring zone HRs to live in their zone by February the 1st, or they would give me a severance package and retire."[66]  She then confirmed that Schumacher told her "if the zone HR director did not choose to relocate, they would be given a severance package."[67]  Furthermore, she does not dispute that, in March 2019, she told Schumacher "[y]ou gave me a date of April 5th I had to be out."[68]  Still worse, Nygren alleged in her complaint that "Schumacher phoned [her] that that [sic] she would need to pack up her belongings and *move into her zone or Dollar Tree would fire her in February 2019*."[69]  That discrepancy cannot be reconciled.  And it goes to the very heart of the issue—whether Schumacher told her the consequences of a failure to move or not.

---

[63] R. Doc. No. 38-5, at 2.
[64] R. Doc. No. 28-4, at 89.
[65] R. Doc. No. 38-5, at 3.
[66] R. Doc. No. 28-4, at 32.
[67] *Id.* at 33.
[68] R. Doc. No. 38-1, at 20.
[69] R. Doc. No. 1, at 7 ¶ 30.

Nygren's declaration that Schumacher never told her that if she did not move she would lose her job is also impossible to reconcile with another portion of the complaint.  The complaint describes her July 2018 email to Gary Philbin as Nygren's effort to "relay[] *what her supervisor had told her*."[70]  And Nygren's email plainly states, "[i]t seems I have until Feb [sic] 2019 to move to Texas—or I no longer have a job."[71]  A few lines later, she reiterated: "Now—at age 69—I am out—unless I pack up my belonging [sic] and move."[72]

These are just two major examples.  But the record is replete with other evidence that squarely contradicts Nygren's declaration in ways that her 'belief vs. knowledge' explanation cannot explain.[73]  The Court simply *cannot* consider the declaration to be competent summary judgment evidence on this issue.  Frankly, the Court's decision to disregard the declaration and not to sanction Nygren or her counsel is a favorable outcome for both.

## B.  Disparate Treatment

The Court next resolves whether Nygren has presented sufficient evidence for her claim to establish a genuine issue of material fact.

### 1.  Contentions

---

[70] *Id.* at 8 ¶ 33 (emphasis added).
[71] R. Doc. No. 28-26, at 1.
[72] *Id.*
[73] The severance letters and their straightforward statements that Nygren's time at Dollar Tree would end in April 2019 because she chose not to move are just one example.

In relevant part, Dollar Tree argues that Nygren's disparate treatment claim is time-barred.[74]  It explains that "[t]he relocation requirement was clearly communicated to [her] on July 13, 2018."[75]  And it notes that in her July 14, 2018 grievance email, she made "clear that as of that date she understood she would no longer have a job if she did not move to Texas."[76]  And, while acknowledging that the exact date Nygren became clearly aware of the requirement to move to Dallas (as opposed to Texas) is unclear, Dollar Tree points to her concession that this occurred no later than August 7, 2018 (well earlier than 300 days before the EEOC charge was filed).[77]

Dollar Tree argues that Nygren's 2018 conversation with Sankey, in which they discussed plans to sue Dollar Tree for age discrimination also makes clear that she was aware of the policy.[78]  Finally, Dollar Tree points to the November 1, 2018 severance package . . . "which confirmed in writing that [Nygren] would be required to relocate to Dallas, and that because she had not agreed to relocate to Dallas, that her Separation Date from employment would be April 5, 2019."[79]

Because Nygren "did not file her Charge of Discrimination with the EEOC until October 22, 2019," well more than 300 days after each of the aforementioned

---

[74] Dollar Tree also argues extensively that the relocation policy was not pretext for firing older ZHRDs.  Though the Court, as explained below, is inclined to agree, the issue is not before it.  For that reason, this opinion omits the parties' treatment of the issue.

[75] R. Doc. No. 28-1, at 15.

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

17

dates, Dollar Tree argues that the disparate treatment claim is time-barred, relying largely on *Phillips* and a Supreme Court case opinion it cited extensively, *Del. State Coll. v. Ricks*, 449 U.S. 250 (1980).[80] Anticipating Nygren's argument that the limitations period did not begin until she was fired, Dollar Tree, quoting *Phillips*, points out that the limitations period for an ADEA claim, "begins to run at 'the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful."[81] Moreover, Dollar Tree continues, "[a]n employment event that is merely an effect of a prior employment decision does not constitute a separate and distinct act that begins the calendar anew."[82] It concludes that because, by Nygren's own admission, she knew by August 7, 2018 that she had to relocate to Dallas or face termination—and believed this was discriminatory—the limitations period began on that day.[83]

Nygren's response is charitably described as internally inconsistent—and her factual contentions in support of her response are, at times, similarly self-contradictory. But the Court will do its best to set them forth.

Nygren's opposition begins with a simple premise: Dollar Tree incorrectly identifies its decision to force her to move as the alleged adverse employment action, rather than its decision to fire her for not doing so. In Nygren's words, Dollar Tree "argues 'in this case, the challenged employment decision is the relocation

---

[80] *Id.* at 16–18.
[81] *Id.* (quoting *Phillips*, 658 F.3d at 456).
[82] *Id.* at 17–18 (quoting *Phillips*, 658 F.3d at 456).
[83] *Id.* at 18.

requirement.'"[84]  According to her, though, "[t]his characterization fails under Fifth Circuit law and it's just as unsupportable on the summary judgment record."[85] Rather, she explains, she "sued [Dollar Tree] for 'firing her for not complying with a discriminatory relocation policy it unlawfully enforced only against its oldest employees.'"[86]

Turning to the time-bar argument itself, Nygren readily concedes that she was aware of the relocation policy and the fact that the alternative was retirement during the summer of 2018.[87]  But this is irrelevant, she explains, because "[r]elocation is not an adverse employment action in the Fifth Circuit."[88]  Because the policy is not actionable, Nygren continues, Dollar Tree's "announcement of the relocation requirement . . . [and] noncompliance consequences . . . started none of the limitations periods."[89]  Nygren commits to this point, explaining that she "wrongly believed she was being discriminated against when Schumacher told her in mid-July she'd have to move into her Zone."[90]

Nygren acknowledges that "*Phillips* and *Ricks* are good law," but suggests they stand for a limited principle: "[W]hen an employer fires an employee and communicates a future 'last day of work,' the limitations period(s) for discrimination

---

[84] R. Doc. No. 38, at 9 (quoting R. Doc. No. 28-1, at 15) (alterations omitted).

[85] *Id.*

[86] *Id.* (quoting R. Doc. No. 1, at 1 ¶ 1).

[87] R. Doc. No. 51, at 1.

[88] R. Doc. No. 38, at 10 (citing, among other opinions, *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016)).

[89] *Id.*

[90] *Id.* at 15.  The Court does not understand how this can be reconciled with Nygren's extensive argument that the policy *was* pretext.

and retaliation actions run from the date the employee was told they were fired, not that last day of work."[91]  She concedes that *Phillips* also "establishe[d] . . . that post-termination odd-jobs don't buy employees extra time to sue for discrimination," but says it offers little beyond that.[92]  Turning to *Ricks*, Nygren argues (1) that denials of tenure enjoy a special place in anti-discrimination law, effectively being treated as delayed firings, and (2) that *Ricks* instructs the Court to focus on when the actual adverse employment action took place.[93]  Applying those principles, she argues that whatever notice she had of the relocation policy and consequences for noncompliance is irrelevant because the adverse employment action had not occurred.[94]  As she puts it: "There's nothing actionable about communicating a discriminatory policy–the wrong occurs when there's an *adverse employment action* (here, firing) that can be linked to the policy."[95]

Confusingly, though, Nygren proceeds to argue that judgment on the time-bar based on the July/August 2018 conversations is inappropriate not because the firing had not occurred yet, but because she did not have unequivocal notice.[96]  She concedes that Dollar Tree "told [her] she would have to relocate into her Zone in July 2018."

---

[91] *Id.* at 10–11 (citations omitted).

[92] *Id.* at 11.

[93] *Id.* at 12–13.

[94] *Id.* at 13.

[95] *Id.*  Nygren abandoned this argument, curiously enough, in her opposition to Dollar Tree's motion to strike, where she stated that Dollar Tree "could have mended its hold on summary judgment had Schumacher declared he told [Nygren] . . . *that she'd be terminated at all* for noncompliance."  R. Doc. No. 51, at 4.  The Court does not understand this about-face (or, for that matter, the notion that Schumacher's failure to declare this would be dispositive).

[96] R. Doc. No. 38, at 13.

And she acknowledges that the letters contained severance dates, but argues that they "were dates for *voluntary separation*."[97]  Without disputing Dollar Tree's position that she "understood what would happen if she didn't move," she explains that only notice starts the limitations period—notice she did not have until January of 2019.[98] In her words: Dollar Tree's "summary judgment evidence establishes only [her] fears and subjective understanding, neither of which suffices legally to cure the lack of any concrete notice of termination on a date certain."[99]

In her opposition to Dollar Tree's motion to strike her unsworn declaration, Nygren's argument regarding notice continues to shift.  Walking back from her previous statements, she concedes "[t]he summary judgment record is relatively clear that in July/August 2018 Chris' supervisor Steve Schumacher told her about a relocation policy and that he gave her an option to retire with severance if she didn't want to move."[100]  Having made that concession, she insists that the record is "less clear" as to "*whether* or *when* Schumacher unequivocally told [her] . . . *she'd be fired* for noncompliance with the policy or . . . *there was a deadline for complying with the policy*."[101]

She then argues that the Court must reject Dollar Tree's arguments because they "ask[] the Court to draw inferences based on . . . *what* [she] subjectively knew,

---

[97] *Id.* (emphasis retained).
[98] *Id.*
[99] *Id.* at 14.
[100] R. Doc. No. 51, at 1.
[101] *Id.* (emphasis in original).

and *when* she subjectively knew it."[102]  She then claims, bizarrely, that "the record is *void of any objective evidence that [Dollar Tree] actually gave (or did something that should have given) [her] termination notice at any point in 2018*."[103]  Because "summary judgment evidence is usually rejected where all it shows is subjective belief,"[104] and because "the standard is much more exacting here,"[105] that is not enough, she reasons.[106]

Finally, adding a new argument, Nygren adds that summary judgment on notice is inappropriate because Schumacher testified that "he didn't recall authorizing any terminations in 2018 or Q1 2019" and she testified that "even after Schumacher told her about the relocation policy, she still considered the job hers."[107]

---

[102] *Id.* at 2.

[103] *Id.* (emphasis in original).  This is, of course, untrue, as the factual summary provided above and the Court's analysis in Section III(A) above both demonstrate.

[104] *Id.* (citing *Berry-Jones v. Achieve3000, Inc.*, No. 19-89, 2020 WL 4689213, at *1 (S.D. Tex. May 28, 2020)).  Nygren's statement of law is, of course, wrong.  *Berry-Jones*, an unpublished district court opinion from Texas, dealt with claims relating to an employment dispute and an alleged breach of contract.  2020 WL 4689213 at *1. The plaintiff argued that summary judgment was inappropriate because defendant's evidence was largely conclusory and unsubstantiated.  *Id.*  The court *rejected* the argument, but in doing so, noted the general rule that "conclusory statements, unsubstantiated and subjective beliefs, and speculative statements are not proper summary judgment evidence."  *Id.* at 1–2 (citing *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).  Dollar Tree is not offering its own subjective, unsubstantiated statement that Nygren had notice.  Moreover, a statement by Nygren that she had notice of a fact would *of course* be competent evidence to demonstrate that she had notice of the fact.

[105] What would a "much more exacting" standard than "no subjective evidence can ever be used for summary judgment" would look like, Nygren does not say.

[106] R. Doc. No. 51, at 4.

[107] *Id.*

Dollar Tree replies by attacking Nygren's declaration, concluding that "for purposes of [the instant motion], the Court must find that Dollar Tree had provided Ms. Nygren notice that employment was going to be terminated if she did not relocate and that [she] knew her future termination was inevitable, notwithstanding her perjurious declaration to the contrary."[108]

Turning to Nygren's arguments against summary judgment raised, for some reason, in her opposition to the motion to strike, Dollar Tree points out that the Fifth Circuit has held that the existence of notice "is based upon an objective standard, *focusing upon when the employee knew, or reasonably should have known*, that the adverse employment decision had been made."[109]  "Accordingly, what [Nygren] actually knew – or reasonably should have known – based on what [Dollar Tree] communicated to her regarding a future loss of employment, is not only germane; it is outcome determinative of the statute of limitations issue."[110]

Addressing Nygren's argument that it is misunderstanding the nature of the adverse employment action, Dollar Tree argues that *Ricks* is instructive.  There, the plaintiff argued that "discrimination motivated [his employer] not only in denying him tenure, but also in terminating his employment" at the end of his final contract.[111]  According to Dollar Tree, the *Ricks* Court explained that, "[i]n order for the limitations period[] to commence with the date of discharge . .  the manner in

---

[108] R. Doc. No. 46, at 4.
[109] R. Doc. No. 61, at 2 (quoting *Phillips*, 658 F.3d at 456).
[110] *Id.*
[111] *Id.* at 4 (quoting *Ricks*, 449 U.S. at 257).

23

which [the plaintiff's] employment was terminated [would need to have] differed discriminatorily" from treatment of others who had been denied tenure.[112]  Applying that, Dollar Tree reasons that Nygren "would have to prove that the manner in which her employment was terminated differed discriminatorily from the manner in which Dollar Tree terminated the employment of the other Zone HR Directors (Mr. Sankey and Ms. Peters) who were subjected to the relocation requirement," something she has failed to do.[113]

Dollar Tree also rebuts Nygren's argument that Schumacher's non-use of the word 'fired' is determinative, arguing that "nothing in the *Phillips* or *Ricks* decisions requires that the future loss of employment be communicated using any specific language."[114]  And, rejecting Nygren's contention that the severance letters were inadequate notice that her employment would terminate on a date certain because she did not execute the severance agreements, Dollar Tree points out that "the portion of [the] letters which advised [Nygren] of her Separation Date is not conditioned on her execution of" the waiver and release attached to the letter and that "her Separation Date was going to be April 5, 2019 because the Company understood that she had decided not to relocate, regardless of whether [she] signed the" release or not.[115]

### 2.    Standards

#### a.    The ADEA's limitation period

---

[112] *Id.* (quoting *Ricks*, 449 U.S. at 257) (emphasis omitted).
[113] *Id.* at 4–5.
[114] *Id.* at 5.
[115] *Id.* at 9.

"Under the Age Discrimination in Employment Act (ADEA), an employer may not 'discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Phillips*, 658 F.3d at 455 (quoting 29 U.S.C. § 623(a)(1)). Like most employment discrimination statutes, the ADEA requires plaintiffs to file charges with the EEOC prior to filing a lawsuit.   The parties agree that in this case, Nygren was required to file her charge "within 300 days after the alleged unlawful practice occurred." 29 U.S.C. § 626(d)(1)(B).  "Generally, the limitations period begins on the date of the alleged unlawful employment action; once the plaintiff has knowledge sufficient to support the ADEA claim, the . . . limitations period begins." *Phillips*, 658 F.3d at 455 (citing *Barrow v. New Orleans S.S. Ass'n*, 932 F.2d 473, 477–78 (5th Cir. 1991)).

Sometimes, though, a plaintiff is aware of the allegedly unlawful action well before it occurs; in those cases, the limitations period may begin to run—and even end—before the termination (or other unlawful act) occurs.  For example, "[i]n the context of a non-tenured professor's teaching contract, the limitations period began to run on the date the tenure decision was made and communicated to the plaintiff, 'even though one of the *effects* of the denial of tenure—the eventual loss of employment—did not occur until later.'"  *Id.* (quoting *Ricks*, 449 U.S. at 258) (emphasis retained, alterations omitted).   "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment

25

discrimination." *Id.* (quoting *Ricks*, 449 U.S. at 257).[116]   "Accordingly, the . . . limitations period begins on 'the date of notice of termination, rather than the final date of employment.'" *Id.* at 456 (quoting *Clark*, 854 F.2d at 765). "An employment event that is merely an effect of a prior employment decision does not constitute a separate and distinct act that begins the calendar anew for bringing an ADEA claim." *Id.* (citing *Mull v. ARCO Durethene Plastics, Inc.*, 784 F.2d 284, 289– 90 (7th Cir. 1986)).

But, "the notice of termination must be *unequivocal* to start the running of the limitations period." *Id.* (citing *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 133 (5th Cir. 1992)) (emphasis added). "The existence of notice 'is based upon an objective standard, focusing upon when the employee knew, or reasonably should have known, that the adverse employment decision had been made.'" *Id.* (quoting *Clark*, 854 F.2d at 765).

>   **b.   Establishing disparate treatment under the ADEA and the LEDL[117]**

---

[116] The Fifth Circuit made clear in *Phillips* that, while *Ricks* "involved a claim brought under Title VII . . . its limitations-period analysis also applies to ADEA actions." *Id.* at 455 n.1 (quoting *Clark v. Resistoflex Co.*, 854 F.2d 762, 765 (5th Cir. 1988)).

[117] "With respect to claims of age discrimination, the LEDL is modeled after federal law and should be construed in light of federal precedent." *Sutherland v. Edison Chouest Offshore, Inc.*, No. 19-414, 2020 WL 5436654, at *14 (E.D. La. Sept. 10, 2020) (Vance, J.) (citing *O'Boyle v. La. Tech. Uni.*, 741 So. 2d 1289, 1290 (La. App. 2 Cir. 1999)). "Indeed, Louisiana courts apply the . . . *McDonnell Douglas* burden-shifting framework when analyzing claims of age discrimination under the Louisiana law." *Id.* (citing *Taylor v. Oakbourne Country Club*, 663 So. 2d 379, 383–84 (La. App. 3 Cir. 1995)); *see also Ellsworth v. Winn-Dixie Montgomery, LLC*, No. 14-1666, 2016 WL 6563395, at *1, *9 (E.D. La. Nov. 4, 2016) (Vance, J.) (concluding that analysis of plaintiff's ADEA claim, which failed due to his inability to demonstrate pretext, applied with equal force to plaintiff's LEDL claim). Accordingly, the Court will analyze the two claims as one, something neither party argues is inappropriate.

As explained, "[t]he ADEA . . . prohibit[s] an employer from discharging an employee on account of that employee's age." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015) (citing, in relevant part, 29 U.S.C. § 623(a)(1)). As with most claims of unlawful employment discrimination, there is "seldom . . . eyewitness testimony as to the employer's [age-discriminatory] mental processes." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)). For that reason, "claims brought under [the ADEA] typically rely on circumstantial evidence that is evaluated under the burden-shifting framework first articulated in *McDonnell Douglas* for Title VII claims of employment discrimination." *Id.* (citing *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1504–05 (5th Cir. 1988)); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (establishing the aforementioned framework).[118]

"Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of age discrimination by showing that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Id.* (quoting *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005)).

"If the plaintiff successfully makes out a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the

---

[118] Nygren does not claim to offer direct evidence in support of her claim.

termination." *Id.* (citing *Machinchick*, 398 F.3d at 350). "[O]nce the employer satisfies its burden, the presumption of discrimination 'simply drops out of the picture.'" *Williams v. Waste Mgmt., Inc.*, 818 F. App'x 315, 319 (5th Cir. 2020) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993)).

"If the employer articulates a legitimate reason for termination, then the 'employee must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Alaniz v. U.S. Renal Care, Inc.*, 838 F. App'x 77, 80 (5th Cir. 2020) (quoting *Goudeau*, 793 F.3d at 474) (internal quotation marks omitted). "The ADEA thus requires a but-for standard of causation." *Id.* at 80–81 (quoting *Goudeau*, 793 F.3d at 475) (internal quotation marks omitted). The Fifth Circuit has also described this standard as requiring a plaintiff to "substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." *Tagliabue v. Orkin, L.L.C.*, 794 F. App'x 389, 395 (5th Cir. 2019) (quoting *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002)). To do so, "the plaintiff must put forward 'substantial evidence' to 'rebut[] each of the nondiscriminatory reasons the employer articulates.'" *Id.* (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)). Ultimately, "[i]n determining whether [Nygren's] rebuttal precludes summary judgment, the question is whether [she] has shown that there is a genuine issue of material fact as to whether [Dollar Tree's] reason was pretextual." *Id.* (quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010).

That an "employer's reason may have been incorrect does not *ipso facto* make it a pretext for discrimination." *Williams*, 818 F. App'x at 322. This is because, as stated, the "issue at the pretext stage is whether the employer's reason, *even if incorrect*, was the *real reason* for plaintiff's termination." *Id.* (quoting *Goudeau*, 793 F.3d at 476–77) (emphasis retained, alterations and quotations omitted). "The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decision which are unlawfully motivated." *Campbell v. Zayo Grp., L.L.C.*, 656 F. App'x 711, 715 (5th Cir. 2016) (quoting *Moss*, 610 F.3d at 926). Similarly, "it is not [a court's] place to second-guess the business decisions of an employer, so long as those decisions are not the result of discrimination." *Eyob v. Mitsubishi Caterpillar Forklift Am., Inc.*, 745 F. App'x 209, 212 (5th Cir. 2018) (quoting *Jackson v. Watkins*, 619 F.3d 463, 468 n.5 (5th Cir. 2010)). Put another way, the ADEA has "not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Id.* (quoting *Riser v. Target Corp.*, 458 F.3d 817, 821 (8th Cir. 2006)).

### 3.   Discussion

Before the Court can evaluate Nygren's disparate treatment claim, it must identify the claim's parameters. As noted, Nygren explicitly disavows any reliance on the relocation policy itself, going so far as to argue that a claim based on the relocation policy would fail because it was not an adverse employment action. Taking

Nygren at her word, then, her claim is that she was discriminatorily fired on April 5, 2019.

That understanding of Nygren's claim makes good sense for another reason, too.  The parties have briefed the time-bar issue *ad nauseum*.  But both parties assume that there is no legal distinction between Dollar Tree telling Nygren "you will be terminated on April 5, 2019" and Dollar Tree telling Nygren "you will be terminated on April 5, 2019 if you do not relocate."[119]  Their exhaustive argument is directed entirely at whether Nygren had adequate notice that she would be fired if she did not relocate.

But, as far as the Court can tell, the question of whether that distinction imparts any difference *is* one of first impression in the Fifth Circuit.  At least one circuit, applying *Ricks*, has concluded that, where an earlier (time-barred) discriminatory act has set off a causal chain resulting in the plaintiff's termination, the limitations period begins at the time of the discriminatory act.  *See Hamilton v. Komatsu Dresser Indus., Inc.*, 964 F.2d 600, 604 (7th Cir. 1992).  And, in an earlier case, the Seventh Circuit rejected a plaintiff's argument that the presentation of options for continuing employment during the meeting at which the terminated employee 'received notice' created a genuine issue.  *Mull*, 784 F.2d at 288–89.

Those decisions make sense, and seem to comport with the sentiments expressed in *Ricks* and *Phillips* that limitations periods reflect a policy of "protect[ing]

---

[119] Nygren suggests in a footnote that whether the second scenario would begin the limitations period is a matter of first impression. R. Doc. No. 51, at 2 n.3.

employers from the burden of defending claims arising from employment decisions that are long past," 449 U.S. at 256–57, even if that "rule . . . is not without potential cost for an employee to apply." 658 F.3d at 456. Moreover, Nygren's argument, at its heart, is that the policy was a means for Dollar Tree to achieve the discriminatory ends of firing her—something she first claimed the day after the policy was announced. And finally, it would make little sense if Dollar Tree were left in a worse position by giving Nygren an option of relocation than if it had fired her outright.

Still, Nygren is the plaintiff and is entitled to bring whatever claims she wishes—and she repeatedly made clear that her claim is based on the firing, not the policy. Accordingly, the Court will treat Nygren's claim as relating to her firing on April 5, 2019, not the enforcement of the relocation policy.

But, while that claim is not barred by the limitations period, it falls flat as a matter of law because, assuming a *prima facie* case arguendo, Nygren fails to offer *any* evidence of pretext. Because Dollar Tree has easily satisfied its responsibility to point to a legitimate, non-discriminatory reason for Nygren's firing (her failure to relocate), that is dispositive.

As Nygren acknowledges, she was fired for not adhering to the relocation policy.[120] As noted, *Ricks* dictates that, in such a scenario, Nygren must demonstrate that "the manner in which [her] employment was terminated differed

---

[120] *See, e.g.*, R. Doc. No. 38, at 1 (arguing the limitations period began on "the date [she] was unequivocally *fired* for not relocating"); *id.* at 7 (stating that Nygren "was fired in April 2019 because she did not comply with" Dollar Tree's policy) (quotation omitted); *id.* at 16 (reiterating that Nygren was fired "on April 5, 2019 for not complying with what she alleges is a discriminatory relocation policy").

discriminatorily from the manner in which [Dollar Tree] terminated other [employees] who also" were in violation of the policy.  449 U.S. at 258.  The Fifth Circuit has applied that principle to situations where the finality of the adverse employment action was very much undetermined.  *See Joe v. City of Houston Fire Dep't*, 211 F.3d 124, 124 (5th Cir. 2000) (discussing and analyzing *Ricks* and concluding that the limitations period for a firefighter's claim began when his supervisor informed him of the initial action and his right to appeal it, rather than when his appeal concluded unsuccessfully).

As Dollar Tree notes, and Nygren does not contest, those employees are Sankey and Peters, both of whom refused to relocate.[121]  But the only difference between their end-of-employment and Nygren's is that they accepted the severance package she refused.[122]  That offers no hint of pretext from which a reasonable jury might conclude that Nygren's firing was for any reason other than her failure to comply with the relocation requirement.

Nygren argues that her firing must be contrasted to the retention of the three youngest ZHRDs.[123]  But, as she acknowledges, those three ZHRDs *already lived in their zones*, which was a prerequisite to the policy's application.[124]  Dollar Tree did not retain those ZHRDs despite their noncompliance with the policy—it *concluded they were in compliance.*

---

[121] R. Doc. No. 61, at 4–5.
[122] *Id.* at 5.  Nygren does not argue, as far as the Court can tell, that she was treated worse than Sankey and Peters.
[123] *See* R. Doc. No. 38, at 17–18.
[124] *See, e.g., id.* at 18 (acknowledging this fact).

Nygren argues that, because she was told to move to her Zone VP's city, not just to the Zone itself, she was "fired for not doing some her younger comparators were never asked to do."[125]   She argues that "[t]here's really simply no other difference than age between the ZHRDs and summary judgment isn't the place for . . . judgment calls."[126]  This ignores a basic factual difference between the two groups: where they lived.  Dollar Tree required those living outside their zone to move to their Zone VP's location.  Dollar Tree allowed those not living outside their zone to remain where they were.  Nygren does not suggest that the Zones were altered to force only the three oldest ZHRDs to move.  But even assuming there was no difference between those policy applied to and those it did not, that evidence would go to the pretextual nature of *the policy itself*, rather than Dollar Tree's treatment of those to whom it applied, which is what *Ricks* demands.[127]

---

[125] *Id.* at 19.

[126] *Id.* at 19–20.

[127] And, though it need not reach the matter, the Court would also find that Nygren has failed to offer substantial evidence that the relocation requirement was itself pretextual.  While the record indicates the three older ZHRDs were subjected to the policy and the three younger were not, it is undisputed that the three older ZHRDs were the *only three who lived outside their zones*.  For this reason, it would be difficult to see them as similarly situated for purposes of the policy.

Nygren offers substantial argument and evidence about the wisdom of Dollar Tree's new policy and the extent to which it departed from the company's past practice.  She also argues that, given the size of the zones, relevant airline routes, and other factors, the relocations were unlikely to achieve their stated purpose.  But, "disputing [a defendant's] business judgment is not enough to prove pretext without producing evidence that the reasons stated were pretextual." *Goree v. Comm'n Lincoln Parish Detention Ctr.*, 437 F. App'x 329, 334 (5th Cir. 2011) (per curiam) (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999)); *see also Moss*, 610 F.3d at 926 ("The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions." (quoting *Bienkowski*, 851 F.2d at 1507–08)).  The sole piece of

33

Accordingly, Nygren has failed to raise a genuine issue of material fact as to whether Dollar Tree's legitimate, non-discriminatory reason for firing her, her failure to comply with the relocation policy, was pretextual. That, in and of itself, warrants summary judgment for Dollar Tree on the claim. However, given the dearth of caselaw on the issue presented above, the Court will also evaluate the claim Nygren disclaims—that the policy itself was pretext for Dollar Tree's discriminatory firing of her on the account of her age.

That claim,[128] the Court must conclude, would be time-barred. *Phillips* is clear: The Court must evaluate "when [Nygren] knew, or reasonably should have known, that the adverse employment decision had been made." 658 F.3d at 456. The test is, as Nygren notes repeatedly, "objective." *Id.* But it does not only ask when

---

evidence that seems actually aimed at indicating Schumacher's stated reasons for the policy change were *pretextual*, rather than an exercise of poor judgment, is an assertion in Nygren's declaration that Brian Prettyman, the Zone 5 VP, actually lives in Washington, not Dallas, supported by a November 27, 2020 Christmas card from Prettyman with a Washington return address (though Nygren acknowledges he maintains *a* residence in Dallas). R. Doc. No. 38-5, at 2; 7. But ignoring the fact that Nygren admitted the validity of a chart listing Prettyman's place of residence as Dallas, R. Doc. No. 38-1, at 9, a card from late November 2020 does not call into question Prettyman's place of residence at the time the policy was instituted in mid-2018 or when Nygren was terminated in April 2019. Uncontested record evidence indicates that, at the relevant time, Prettyman lived in Dallas. And it is also undisputed that the replacement for each of the departed ZHRDs lives in the location to which the ZHRD was required to relocate. R. Doc. No. 38-1, at 19–20.

[128] And to be clear, Nygren *repeatedly* disavows any such claim, arguing that "there is no authority for the proposition that an employee's indication of unwillingness to comply (even assuming they know of the consequences) constitutes [an] adverse employment action." R. Doc. No. 38, at 15. The Court offers this analysis only to indicate that, even if Nygren had raised a claim based on the 'relocate or lose your job' requirement, and even if there was a dispute of material fact as to pretext, it would likely be time-barred.

Nygren *should* have known.  Actual knowledge works just as well.  And, as the Court sets forth *infra*, no reasonable factfinder could doubt that Nygren was aware of the consequences of her failure to relocate prior to the end of December 2018.[129]  Because more than 300 days elapsed between Dollar Tree's notice to Nygren and the filing of her EEOC charge, the claim would be barred.

The evidence that Nygren knew her options were to move or leave Dollar Tree (or perhaps apply for another position)[130] is overwhelming.[131]  Nygren testified that, during their July 13, 2018 call, Schumacher told her Dollar Tree was "requiring zone HRs to live in their zone by February the 1st, or they would give me a severance package and retire."[132]  When asked again, she confirmed that Schumacher told her

---

[129] Though it is not the basis for any holding, the Court finds Nygren's pretext argument difficult to reconcile with her 'lack of notice' argument.  For the relocation policy to have been an effective pretext for discriminatorily firing Nygren, Dollar Tree would have needed to know Nygren would *never* relocate to her Zone or, at the very least, Dallas.  And if it was in fact true that Nygren would never move to Dallas, how would she not immediately recognize (as she claimed in her email to Philbin) that Dollar Tree was trying to force her out?

[130] Nygren does not argue that Schumacher's suggestion that she might apply for another position at Dollar Tree somehow made the notice she was given less definite.  And *Phillips* held that a plaintiff who was terminated and re-hired for a temporary position "without a stated end-date" four days later had unequivocal notice at the time she became aware of the first termination, intervening circumstances notwithstanding.  658 F.3d at 454, 456.

[131] There is, as will be explained *infra*, an absence of sufficient evidence to raise a *genuine* dispute.

[132] R. Doc. No. 28-4, at 32.  During the call, Nygren expressed concern about the impact that a February 1 termination date would have on her compensation, as Dollar Tree's stock options and bonuses were payable to those employed at the end of March. *Id.* at 35–36.  Schumacher told her Dollar Tree would "look into it." *Id.* at 36.

Clearly, this conversation would not suffice as notice that the termination would happen on April 7.  However, Nygren received clear notice of the actual date later in 2018, as described *infra*.  Moreover, it is not clear that the absence of such notice

"if the zone HR director did not choose to relocate, they would be given a severance package[.]"[133]   When asked if Schumacher "specifically reference[d] the term 'retirement' or . . . just sa[id] 'severance package,'"  Nygren said she "believe[d] he referenced the term 'retirement.'"[134]  When asked if she considered "retirement to be a voluntary departure," she replied "No, not in this case."[135]   Nygren's testimony makes clear that, following the meeting, she actually believed her options were to move or leave the company.

In an email sent the very next day, Nygren wrote to Philbin, Dollar Tree's CEO, and complained about the phone call, explaining that "[i]t seems I have until Feb [sic] 2019 to move to Texas—or I no longer have a job."[136]  A few lines later, she reiterated: "Now—at age 69—I am out—unless I pack up my belonging [sic] and move."[137]  In a response, Philbin explained why Dollar Tree made the decisions it did.[138]  The email

would be dispositive.  At least one court in the Fifth Circuit, applying *Phillips* and an out-of-circuit opinion, *McAleer v. Prudential Insurance Co. of Am.*, 928 F. Supp. 2d 280, 283–85 (D. Mass. 2013), has concluded that a change in the date of termination after plaintiff receives notice does not restart the clock or otherwise render the plaintiff's original notice insufficient for the limitations period to begin.  *See Wright v. McHugh*, No. 13-449, 2014 WL 201072, at *8 (W.D. Tex. Jan. 17, 2014) (concluding that a second termination letter with a later date did not reset the limitations period).
[133] *Id.* at 33.
[134] *Id.* at 37.
[135] R. Doc. No. 28-26, at 1.  The complaint alleges that "between October 4 and October 9, Schumacher phoned [Nygren] that Dollar General [sic] wasn't just requiring its Zone HR Directors to *live in their Zone* . . . but that they *must also live in the same city as their Zone VP*." R. Doc. No. 1, at 10 ¶ 50.  However, the parties agree that the specific requirement of Dallas was discussed prior to August 7, 2018 and that Schumacher initially rejected the idea of a move to Houston.  *See, e.g.*, R. Doc. No. 28-4, at 71.
[137] *Id.*
[138] *Id.*

conversation is also strong evidence that Nygren understood following the meeting that her options were to, in her words, "move" or be "out."

During her testimony, Nygren stated that she believed her email to Philbin was a report that the relocate or move policy was age discrimination, explaining: "I put age in there to show that it is age discrimination.  It doesn't take a genius to figure that out.  If she put her age in there, she's referring to age discrimination.  It automatically comes up."[139]  When asked to confirm that she believed the email was a complaint of age discrimination, Nygren responded: "In the context that it was put in, yes."[140]  That statement only makes sense if Nygren was aware of the policy.

Nygren also testified that, in a subsequent conversation with Schumacher, she told him she found "it interesting that he had—he had decided on [Sankey] and [herself] to either move or retire" while, as she believed at the time, a different individual had also been offered a different job.[141]  This, like so many other statements, would make no sense unless Nygren believed she had been given that ultimatum.

The severance proposals are also strong evidence that Nygren had adequate notice.  The first, dated September 7, 2018, states that, "[a]s we have discussed, Dollar Tree decided that all Zone Human Resources Directors should reside in the geographic area that they support.  You have decided not to relocate to your Zone and

---

[139] R. Doc. No. 28-4, at 112.
[140] *Id.*
[141] *Id.* at 52.

instead have asked to continue your employment until you retire in April 2019."[142] The second, dated October 4, 2018, contained identical language.[143] These letters are still more evidence that Nygren objectively knew or should have known that her employment would terminate April 5, 2019.

On October 9, 2018, Nygren emailed Kay Stockwell, a Dollar Tree attorney, forwarding her Schumacher's email attaching the second letter.[144] She told Stockwell "I did ask about moving to Houston—my daughter lives there.  Houston is in Zone 5. I, then, was told I had to move to Dallas—city specific.  I do not want to retire—I am being told—move to Dallas or retire."[145]

Dollar Tree responded by drafting a *third* letter, dated October 16, 2018 but sent by email to Nygren on November 1 of that year.[146]  The letter is structurally similar to the first two, but makes clear that Nygren must move to Dallas.[147]  It states: "As we have discussed, Dollar Tree decided that all Zone Human Resources Directors should reside in the geographic area that they support, *specifically Dallas for Zone 5.  You have decided not to relocate to Dallas* and instead have asked to continue your employment until you retire in April 2019."[148]

---

[142] R. Doc. No. 28-31, at 1.  Nygren argues that, because she did not sign the agreement (and the two that followed), they are ineffective.  But whether she signed the agreement or not has no bearing on the question of whether the letter led her to know (or be in a position where she objectively should have known) that her employment would end on April 5, 2019.

[143] R. Doc. No. 28-32.

[144] R. Doc. No. 28-33.

[145] *Id.* at 1.

[146] R. Doc. No. 28-34.

[147] *Id.* at 1.

[148] *Id.* (emphasis added).

There can be little doubt, then, that by October 9, or at the latest, November 1, 2018 (more than 300 days before she filed her EEOC charge on October 22, 2019), Nygren *knew or should have known* that (1) her options were 'move or retire'; (2) though the word 'retire' was being used, the separation was not voluntary; (3) the separation would occur in April 2019; and (4) she had to move to Dallas, not just Zone 5.[149]

Of course, summary judgment is not appropriate simply because the record strongly suggests that a plaintiff cannot succeed. The Court must conclude that there is an absence of a *genuine* material dispute—that *no* reasonable jury could find for the plaintiff. Accordingly, Nygren need only offer modest evidence suggesting she had reason to doubt her termination in order to avoid summary judgment on the time-bar issue.

And so, the question remains: Has Nygren offered competent summary judgment evidence to raise a genuine material dispute as to whether she knew or should have known that she would lose her job if she did not relocate? The Court

---

[149] There is much more evidence to the exact same effect, but most of it is from 2019—within 300 days of when Nygren filed her charge.

The parties generally agree that, at some point after Nygren's counsel sent a demand letter to Dollar Tree, but before she was terminated, Dollar Tree offered to allow Nygren to relocate to Houston, instead of Dallas (though the parties dispute the details of the offer). Nygren has not argued that *this offer* somehow destroyed her notice of the 'move or be fired' requirement; indeed, her opposition to the summary judgment motion takes the position that "[t]he furthest back [Nygren had notice] is" the end of December 2018. R. Doc. No. 38, at 15. Nor has Dollar Tree argued that the offer undercuts the notion that the relocation policy was pretextual.

cannot identify any.  Accordingly, an ADEA claim, assuming one is plausible as a matter of law, based on the 'relocate or leave' decision would be time-barred.[150]

## C.   Retaliation Claim

### 1.   Standard

"The ADEA's antiretaliation provision prohibits an employer from discriminating against an employee for opposing an unlawful practice or asserting a charge, testifying, assisting, or participating in an ADEA proceeding or investigation." *Goudeau*, 793 F.3d at 478 (citing 29 U.S.C. § 623(d)).  "The analytical framework for a retaliation claim is the same as that used in the employment discrimination context." *Id.* (quoting *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)).  "To establish a prima facie retaliation case, a plaintiff must show that '1) he engaged in protected activity; (2) he suffered an adverse employment decision; and (3) a causal link exists between the protected activity and the adverse employment decision.'" *Id.* (quoting *Medina*, 238 F.3d at 684).

"If [Nygren] establishes a prima facie case, [Dollar Tree] must then articulate a legitimate, non-discriminatory reason for its decision to take the adverse employment action." *Miller v. Metro Ford Auto. Sales, Inc.*, 519 F. App'x 850, 852 (5th Cir. 2013) (per curiam) (citing *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008)).  "The burden then shifts to [Nygren] to demonstrate that the

---

[150] A similar claim under the LEDL would likely also be barred, as more than a year elapsed between all the incidents described above (except for the final severance letter) and October 22, 2019, when Nygren filed her EEOC charge.  Regardless, as explained *supra*, the Court doubts Nygren's evidence of pretext would be sufficient to withstand summary judgment.

reason articulated by [Dollar Tree] is a pretext for retaliation." *Id.* (citing *Hagan*, 529 F.3d at 624).   "'Temporal proximity alone is insufficient' to survive summary judgment at the pretext stage" absent other significant evidence of pretext. *Musser v. Paul Quinn College*, 944 F.3d 557, 564 (5th Cir. 2019) (quoting *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 334 (5th Cir. 2017)).   Putting it another way, the Fifth Circuit has also indicated that temporal proximity standing alone cannot *both* establish causation *and* demonstrate pretext.   *See Allen v. Houston Indep. Sch. Dist.*, 689 F. App'x 238, 243 n.5 (5th Cir. 2017) (per curiam) (citing *Lawrence v. Uni. of Tex. Med. Branch at Galveston*, 165 F.3d 309, 312 (5th Cir. 1999)).

## 2.   Discussion

Nygren's original retaliation claim was that "after [she] complained about what she felt was a Dollar Tree 'policy' only being enforced against aged workers, Dollar Tree retaliated by . . . intensifying its already discriminatory 'policy' (now she wouldn't just have to move into her Zone; she'd be fired if she didn't move into her Zone VP's residence city) . . . denying her the ability to find alternate employment . . . and terminating her."[151]   The claim was, no doubt, based on Nygren's email to Philbin—the 'complaint' that seems to have occurred before the requirement of a move to Dallas became clear.   But Nygren concedes that the claim (and a similar state-law claim) is time-barred.[152]

---

[151] R. Doc. No. 1, at 19–20 ¶ 105.
[152] R. Doc. No. 38, at 1, 23.

However, Nygren offers a brief argument that her attorney's February 13, 2019 settlement demand letter supports a retaliation claim because she was terminated two months later. Nygren makes no effort to set out the elements of a prima facie claim, let alone argue that she has met her burden. In fact, she offers no legal argument at all, stating only that the claim "ought not to be dismissed because it's not made a target on this motion."[153]

In response, Dollar Tree argues that the claim (1) "fails as a matter of law because [Nygren] has presented no evidence of the required causal link between the alleged protected activity and the termination of [her] employment"; and (2) "fails because she has not produced any evidence showing that [Schumacher's stated business reasons for enforcement of the relocation requirement are pretext for unlawful retaliation."[154]

In support of its primary argument, Dollar Tree notes that Nygren "testified (and is bound by the admissions in her Complaint) that Dollar Tree had already made the decision that her employment would end on April 5, 2019 if she did not relocate."[155] Dollar Tree also points out that "[t]he February 13, 2019 demand letter cites the prior 'move or be terminated' ultimatum and [states] that '[Nygren's] days with Dollar Tree are numbered.'"[156] Dollar Tree argues that it "is axiomatic that the alleged discriminatory action  that is [the] basis for opposition activity (the relocation

---

[153] *Id.* at 23.
[154] R. Doc. No. 46, at 9–10.
[155] *Id.* at 9.
[156] *Id.* (citing R. Doc. No. 46-2, at 5). The Court has not considered the demand letter except for the purposes of evaluating Nygren's claim based on it.

requirement) cannot also be a retaliatory adverse employment action."[157]   It concludes that Nygren "has presented no factual evidence proving that the February 13, 2019 demand letter was the 'but for' cause for the termination of her employment on April 5, 2019 . . . [a]nd her Opposition has not identified any other subsequent adverse employment action."

As an initial matter, the Court is hard-pressed to conclude that a claim of retaliation based on the settlement demand is properly before it.  While the demand is mentioned briefly during the complaint's factual allegations, there is no hint that it forms the basis of Nygren's retaliation claim.[158]  But even if the Court were to look past that, and the repeated references to a "move or be fired" requirement in the complaint and Nygren's testimony, the claim would still fail.

In its original motion, Dollar Tree argued that Nygren "has no evidence showing that [Schumacher] did not rely on [the stated business reasons set forth in Philbin's email]" in firing Nygren "and has no other evidence of retaliatory motive."[159] Dollar Tree has briefed its legitimate, non-discriminatory reason for the retaliation extensively.  Nygren did not respond to that argument.  Therefore, even if she had

---

[157] *Id.* at 10.

[158] The Court also rejects Nygren's argument that the Court should deny summary judgment on the claim because it was not "made a target" of the motion.  The motion *did* target the retaliation claim.  R. Doc. No. 28-1, at 22–24.  It did not 'target' a retaliation claim *based on the demand letter* (perhaps because it had no reason to think that was the basis for Nygren's claim), but its argument that Nygren cannot demonstrate pretext applies with equal force to the claim Nygren now raises.

[159] *Id.* at 24.

set forth a *prima facie* retaliation claim, she has not carried her burden to demonstrate pretext, dooming the claim.

In fact, the only portion of Nygren's 'argument' that can be read to even imply causation or pretext is her reference to the fact that Dollar Tree fired her less than two months after she sent the demand letter.[160]  But, ignoring Nygren's failure to actually argue 'temporal proximity', and assuming *arguendo* that, in this case, the two month gap might be short enough to demonstrate causation, it *cannot* carry the day as to pretext.[161]  *See, e.g.*, *Musser*, 944 F.3d at 564.  For these reasons (and likely others) the retaliation claim fails.  The Court will dismiss it with prejudice.

### D.    "Quid Pro Quo" Claim

Dollar Tree argues (as it did during an April 13, 2021 status conference regarding the instant motion) that the 'quid pro quo' age discrimination claim should be dismissed because "no such claim has ever been recognized by any state or federal court interpreting the ADEA or the LEDL" and Nygren has failed to offer any authority to the contrary.[162]

In response, Nygren cites commentary to the Third Circuit's pattern jury instructions for ADEA hostile work environment claims, which note they "do not include a pattern instruction for quid pro quo claims. This is because quid pro quo

---

[160] R. Doc. No. 38, at 23.

[161] Though the Court does not rest on this point, it cannot see how a reasonable jury would conclude that Dollar Tree's termination of Nygren on April 5, 2019 was in retaliation for a settlement demand letter stating that *explicitly acknowledges* (and complains of) Nygren's impending "forced retirement on April 1, 2019."  R. Doc. No. 46-2, at 5.

[162] R. Doc. No. 28-1, at 24.

claims are almost invariably grounded in sex discrimination, and the ADEA applies to age discrimination only.  If an ADEA claim is ever raised on quid pro quo grounds, the court can modify Instruction 5.1.3 for that occasion."  3C Fed. Jury Prac. & Instr. § 173:22 (6th ed.).

Nygren argues she "faced a discriminatory system of relocation requirements based on her age" and "[t]he system was not one [she] wanted to participate in, but if [she] agreed to submit to the discriminatory system, she could avoid potential job detriment."[163]  Because "she was terminated" when "she refused to fully comply," and because her "refusal to submit to the . . . policy was a motivating factor in" Dollar Tree's decision to fire her, she explains, she has stated a claim.[164]

Setting aside inconsistencies between that factual summary and Nygren's detailed treatment of her other claims, the claim is significantly under-briefed (Nygren has made no effort, for example, to explain how her brief description of the relevant fact—which lacks citations to the record—establishes a *prima facie* case based on the Third Circuit instructions).  Furthermore, the Tenth Circuit has described 'quid pro quo' harassment as "unique to sexual harassment cases."  *Stapp v. Curry County Bd. of County Comm'rs*, 672 F. App'x 841, 847 (10th Cir. 2016) (quoting *Wright-Simmons v. City of Ok. City*, 155 F.3d 1264, 1270 (10th Cir. 1998)). And, although the commentary to the Third Circuit instructions does countenance the *possibility* that such a claim might be "raised," Nygren has not pointed to any

---

[163] R. Doc. No. 38, at 24.
[164] *Id.*

case where this actually occurred.  Based on the record and briefing in front of it, the Court can only conclude that Nygren has failed to establish the existence of such a claim; it will therefore dismiss the claim with prejudice.

## IV.   CONCLUSION

Accordingly, for all the reasons above,

**IT IS ORDERED** that Dollar Tree's motion for summary judgment is **GRANTED**.  The Court grants unopposed summary judgment on Nygren's ADEA retaliation claim based on the 2018 email, her state law retaliation claim, her harassment claim, and her hostile work environment claim.  The Court grants summary judgment over Nygren's opposition on her ADEA and LEDL disparate treatment claims, her ADEA retaliation claim based on the 2019 demand letter, and her quid pro quo claim.

**IT IS FURTHER ORDERED** that Dollar Tree's motion to strike and for sanctions is **GRANTED IN PART** and **DENIED IN PART** in that the Court treats the declaration as a sham affidavit.  However, the Court, exercising its discretion, declines to impose sanctions.

**IT IS FURTHER ORDERED** that Dollar Tree's motion to exclude testimony is **DISMISSED AS MOOT**.

New Orleans, Louisiana, August 24, 2021.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**